OPINION OF THE COURT
David B. Saxe, J.
i. ISSUE
The principal issue that I am asked to resolve in connection with this motion is whether our courts should recognize, as a matter of constitutional law, a municipality’s obligation to zone for low- to moderate-income housing in accordance with the doctrine established in the seminal New Jersey zoning cases, Mount Laurel I and Mount Laurel II.
II. INTRODUCTION
Asian Americans for Equality, an organization that represents the legal interests of Asian Americans has sued the City of New York, as a result of its enactment of the zoning amendment under scrutiny here, accusing them of having devised a master plan of neighborhood gentrification and *70 "planned shrinkage” in order to exclude and displace[1] low-income Chinese persons from Chinatown and New York City generally in favor of a predominantly upper-income population.
The zoning amendment is challenged on constitutional grounds as not being the product of a "well-considered plan” (Berenson v Town of New Castle, 38 NY2d 102 [1975]) since it is allegedly not responsive to the critical need for low-income housing in the Chinatown area. Additionally, it is alleged in a separate cause of action that New York City, in exercising its delegated zoning powers for the general welfare of the community, is constitutionally obligated to affirmatively afford a realistic opportunity for the construction of low- and moderate-income housing for the many present and future low-income residents of Chinatown needing decent and affordable housing and that the city has failed to live up to this mandate. This cause of action is predicted upon the legal standard that is controlling in New Jersey and set forth in the cases of Southern Burlington County N.A.A.C.P. v Township of Mount Laurel (67 NJ 151, 336 A2d 713 [1975], cert denied 423 US 808 [Mount Laurel I]) and Southern Burlington County N.A.A.C.P. v Township of Mount Laurel (92 NJ 158, 456 A2d 390 [1983] [Mount Laurel II]), but which has not yet been recognized as the law of New York. As noted, an issue before me is whether *71 the Mount Laurel doctrine should be accepted as the law of New York.
The plaintiffs also challenge the validity of a special permit granted to Henry Street Partners pursuant to the zoning amendment. They argue it is unconstitutional because the proposed development will consist solely of luxury dwellings and that the city, by promoting this type of project, will displace Chinatown’s low-income tenants and preclude any realistic opportunity for the future development of low-income housing in the Chinatown area. The plaintiffs seek declaratory and injunctive relief.
The defendants, the City of New York, have moved to dismiss the action on the ground that the zoning amendments and the special permit establish a rational and balanced plan for the Chinatown area pursuant to the laws and Constitution of New York which require neither a specific form of land use regulation in any particular district of a municipality nor municipal land use regulations which ensure the construction of low- and moderate-income housing.
III. FACTS
The zoning amendment challenged here was adopted by the Board of Estimate on August 20, 1981 and established the Special Manhattan Bridge District (District) in lower Manhattan. Portions of this newly created District are located in the Chinatown section of Manhattan. The amendment was proposed by the New York City Planning Commission upon the agency’s completion of "The Manhattan Bridge Area Study”[2] (Study). The Study reported that the Chinatown area suffers from a severe housing shortage and overcrowded living conditions resulting in part from a continuing influx of Chinese immigrants into the New York City area.
In establishing the District, the New York City Planning Commission focused primarily upon the residential areas of the Study. For example, the Commission found that within the entire Manhattan Bridge Study Area there are 675 multifamily structures. Of these, only 2% are equipped with eleva *72 tors, the overwhelming majority consists solely of walk-ups; 85% are old law tenements built prior to 1901; only 11% were built between 1901 and 1929 and are thus subject to the slightly higher standards of New York City’s 1929 Multiple Dwelling Law. The Commission also found that the housing stock in two smaller denominated subareas[3] of the Manhattan Bridge Study Area consists of old apartments which lack adequate facilities. But, while building violations are common, there are virtually no abandoned buildings in the area. It was further noted that despite the inferior and dilapidated condition of the buildings, they are attractive because they provide relatively inexpensive living quarters for the predominantly low-income residents of Chinatown.
Of particular importance is the fact that the current residential density in these areas exceeds that permitted under the existing zoning laws. This has retarded new residential development since newly constructed buildings would have to contain fewer units than those being replaced.
The New York City Planning Commission concluded that there is a critical need for affordable, quality housing for Chinatown’s low-income residents. It further recognized the need not only to maintain the inventory of low-income housing but also to augment the supply in view of the anticipated need for housing for future Chinatown residents. So the Commission proposed the establishment of "The District” which was designed to preserve the residential character of the Chinatown community, encourage new residential development, promote the rehabilitation of existing housing stock, and protect the scale of the community.
Since the application of the existing zoning laws to the housing situation in Chinatown would actually thwart new development and construction there, the city, in order to promote residential construction, devised an incentive program to allow an increase in the present density requirements for qualifying developers. The key aspect of this program is the availability of "floor area bonus”[4] to developers who *73 provide certain "amenities” to the Chinatown community such as new community facility space, subsidized units for low- and moderate-income families, and rehabilitation of existing housing structures.
The zoning amendment requires that each proponent apply for a special permit[5] allowing the Commission an opportunity to determine whether the proposed specifications comport with *74 the character of the community and whether the developer is entitled to a floor area bonus.
Here a special permit was granted by the Board of Estimate to the Henry Street Partners on April 14, 1983, in connection with its application to construct a 21-story residential building consisting of 87 condominium units, with proposed sale prices ranging from $170,000 to $500,000, on a vacant parcel currently used as an open parking lot. In order to generate a floor area bonus, Henry Street Partners incorporated community facility space, including a pool, into the design of the proposed Henry Street Towers, which it agreed would be deeded over to the YMCA. It further agreed to contribute $500,000 to the New York City Department of Housing Preservation and Development to be utilized to rehabilitate or otherwise subsidize low- and moderate-income housing within the District.
IV. THE MOTION TO DISMISS
To succeed on this motion to dismiss the defendants are required to show that even assuming all of the allegations of the plaintiffs’ verified complaint are true (Rainbow Shop Patchogue Corp. v Roosevelt Nassau Operating Corp., 34 AD2d 667 [2d Dept 1970]), and viewed in a light most favorable to the plaintiffs (Schuster v City of New York, 5 NY2d 75, 87 [1958]), that the complaint sets forth no basis upon which the amendment to the zoning resolution might be challenged. The concern at this stage is not whether the plaintiffs can prove a cause of action but whether they have adequately alleged one. (Guggenheimer v Ginzburg, 43 NY2d 268 [1977].) For the reasons set out, I hold that the plaintiffs’ first three causes of action challenging the validity of the zoning amendment and the special permit state valid causes of action and therefore the defendants’ motion to dismiss is denied to that extent.
A. Validity of Zoning Amendments — General Principles
Was the zoning amendment adopted by the Board of Estimate on August 20, 1981, which created the Special Manhattan Bridge District, a valid exercise of the State Legislature’s police power to promote the public health, safety and general welfare?
The enactment and amendment of zoning resolutions is a legislative exercise of police power with the purpose of regulating land use and development. (Kravetz v Plenge, 84 AD2d 422, 427-428 [4th Dept 1982].) Municipalities, including New *75 York City, are empowered by delegation of the police power reserved by the New York State Constitution to the State Legislature to regulate land and property use through exercise of the zoning power. (NY Const, art IX, § 2.)
The New York General City Law § 20 (25) requires that zoning resolutions be "designed to promote the public health, safety and general welfare and shall be made with reasonable consideration, among other things, to the character of the district * * * in accord with a well considered plan.” This has been interpreted to require "that consideration must be given to the needs of the community as a whole.” (Udell v Haas, 21 NY2d 463, 469 [1968].) Further, once a priority community need has been identified, a developmental scheme which ignores or does not make reasonable provisions to meet that need violates the constitutional or statutory mandate to regulate for the health, safety and welfare of the community. (Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville, 51 NY2d 338 [1980], cert denied 450 US 1042; Berenson v Town of New Castle, 38 NY2d 102, supra; Matter of Golden v Planning Bd., 30 NY2d 359 [1972], appeal dismissed 409 US 1003; Kravetz v Plenge, supra.) Similarly, any rezoning by a municipality must not conflict with the fundamental land use policies and development plans of the community. (Udell v Haas, 21 NY2d, at p 472.)
A strong presumption of validity and constitutionality attaches to legislation enacted by a municipality (Lighthouse Shores v Town of Islip, 41 NY2d 7 [1976]; Herkimer Corp. v Village of Herkimer, 38 AD2d 456 [4th Dept 1972]), including its enactment of zoning ordinances and amendments (Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville, supra; Kravetz v Plenge, supra; Curtiss-Wright Corp. v Town of E. Hampton, 82 AD2d 551 [2d Dept 1981]). However, the presumption is rebuttable and, when attacked, courts must examine the zoning and determine whether the constitutional requirements in both formulation and application have been satisfied (Matter of Golden v Planning Bd., 30 NY2d, at p 377; Curtiss-Wright Corp. v Town of E. Hampton, 82 AD2d, at p 553). In determining whether a zoning resolution is designed to promote public health, safety and general welfare and is a legitimate exercise of police power, the circumstances of each case must be examined. (Euclid v Ambler Co., 272 US 365, 387 [1926].)
B. Exclusionary Zoning — Applicable Standard — Contentions
Does the Mount Laurel doctrine apply in New York? In this *76 connection, it is necessary to examine the landmark case of Berenson v Town of New Castle (supra) which enunciated the "well-balanced test” as well as the two New Jersey Mount Laurel decisions which stand for the proposition that municipalities, by their land use regulations, are affirmatively required to make possible an appropriate variety and choice of housing and must provide the opportunity for low- and moderate-income housing in their regulations to the extent of their present and prospective needs. New York has not previously accepted a similar standard which imposes affirmative obligations upon municipalities.
Briefly stated, the plaintiffs contend that the Mount Laurel doctrine, which is more expansive than the "well-considered plan” test enunciated in Berenson v Town of New Castle (supra), should be adopted as the law of New York and applied in this case. They argue that the principles underlying the Mount Laurel doctrine are equally embedded in the law of New York and further that the court in Berenson, in fact, relied with approval on the first Mount Laurel decision.
They contend that the zoning amendment not only fails to constitute a "well-balanced plan”, but also that the zoning amendment violates the New York State Constitution because it "fails to provide a realistic opportunity for the construction of low-income housing”. They allege that other measures such as "mandatory set-asides of space for low-income housing” are necessary to fulfill the city’s obligations.
The defendants argue that the Mount Laurel doctrine does not represent the governing law of New York and therefore any causes of action premised upon it must, as a matter of law, be dismissed. On the merits, they contend that the zoning regulations do not create any exclusionary obstacles to the construction of low- and moderate-income housing and, in fact, contain incentives to the creation of such housing. They therefore contend that under either test, the zoning regulations are valid.
C. Berenson v Town of New Castle
Berenson v Town of New Castle (supra) involved a zoning ordinance enacted by the Town of New Castle, a relatively quiet suburban community located in Westchester County, that excluded multifamily residential housing from its permitted uses. The Court of Appeals, on certified question, held that the applicable test in assessing the validity of a zoning ordinance is whether the ordinance represents (1) a well-balanced *77 plan and (2) whether consideration was given to regional housing needs and requirements.
In reaching a determination of whether there exists a well-balanced plan, the court stated that the needs of the particular community must be considered since "what may be appropriate for one community may differ substantially from what is appropriate for another” (Berenson v Town of New Castle, 38 NY2d, at p 110). "Balanced” according to the court, however, does not mean "that a community must maintain a certain quantitative proportion between various types of development^]”. (38 NY2d, at p 109.) Then the Court of Appeals instructed the lower court on factors to be considered in determining whether the New Castle ordinance constituted a well-balanced plan. It stated: "[T]he court must ascertain what types of housing presently exist in New Castle, their quantity and quality, and whether this array adequately meets the present needs of the town. Also, it must be determined whether new construction is necessary to fulfill the future needs of New Castle * * * and if so, what forms the new developments ought to take.” (38 NY2d, at p 110.)
As to the second requirement, i.e., consideration of regional needs, the court acknowledged that while: "the traditional view [is] that zoning acts only upon the property lying within the zoning board’s territorial limits, it must be recognized that zoning often has a substantial impact beyond the boundaries of the municipality”. (Berenson v Town of New Castle, supra, p 110.)
Thus, the court reasoned that the examination should focus on the general welfare of the residents of the zoning township as well as the effect of the zoning upon neighboring communities. With respect to New Castle’s ordinance, the lower court was instructed to consider whether "New Castle’s neighbors supply enough multiple-dwelling units or land to build such units to satisfy New Castle’s need as well as their own”. (Berenson v Town of New Castle, 38 NY2d, at p 111.)
The matter was then remanded to the Supreme Court, Special Term, where it was found that the zoning ordinance failed to satisfy either prong of the test. Special Term then directed the town to amend its ordinance to provide for the construction of at least 3,500 units of multifamily housing by the end of 1987. The court reasoned that the remedy of affirmative relief was superior to merely declaring the ordinance invalid and remanding the matter to the Town Board *78 because the second option (invalidation), could potentially lead to repetitive and expensive litigation over each new zoning amendment.
The Appellate Division affirmed the lower court’s holding with respect to the invalidity of the zoning ordinance but reversed as to Special Term’s formulation of the remedy of affirmative relief holding that the court was not authorized to "remedy the deficiency by specific judicial fiat” (Berenson v Town of New Castle, 67 AD2d 506, 522.)[6]
D. Mount Laurel I
Mount Laurel I (67 NJ 151, 336 A2d 713, supra) concerned a challenge to a zoning ordinance which permitted only single-family unattached houses throughout an entire township. In 1975, the New Jersey Supreme Court declared the ordinance invalid as violative of the New Jersey Constitution.
As in Berenson (supra) the Mount Laurel I court traced the exercise of local zoning power back to the grant of police power by the people, through the adoption of the State Constitution to the State government.
The court pointed out that shelter, along with food, are the most basic human needs and that the question of whether citizens have adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare.
The court then pronounced the rule that in order to satisfy the constitutional obligation to zone for the general welfare, the municipality, through its zoning ordinance, must affirmatively afford a realistic opportunity for the construction of its fair share of the present and prospective regional need for low- and moderate-income housing and that municipalities could not exclude low- and moderate-income housing from its developmental schemes. The matter was then remanded to the municipality with directions to amend the ordinance in accordance with the guidelines announced by the court. The court commented: "We trust it [the legislators] will do so in the spirit we have suggested, both by appropriate zoning ordinance amendments and whatever additional action encouraging fulfillment of its fair share of the regional need for low and moderate income housing may be indicated as necessary *79 and advisable * * * Should Mount Laurel not perform as we expect, further judicial action may be sought by supplemental pleading in this cause.” (Mount Laurel I, 67 NJ, at p 192, 336 A2d, at p 734.)
E. Mount Laurel II
Eight years later, in Mount Laurel II {supra), the controversy continued, concerning the validity of the new, amended ordinance. In a more expansive opinion, the court in Mount Laurel II affirmed the rule initially set down in Mount Laurel I. The new ordinance was held invalid because it failed to correct the deficiencies of the prior ordinance within the parameters set down by the Mount Laurel I decision, i.e., it did not affirmatively provide a realistic opportunity for the town’s fair share of low-income housing. (Mount Laurel II, 456 A2d, at p 460.)
In fashioning the appropriate remedy, the court went one step further than that taken by the courts in either Berenson v Town of New Castle {supra) or Mount Laurel I {supra) — it placed affirmative obligations on the municipality to take specific steps to secure construction of low- and moderate-income housing. In ordering comprehensive affirmative relief, the court noted that although legislative action is preferable, the township had already been given the opportunity to relegislate and had failed. Thus, the court considered itself obliged, in light of the Legislature’s failure, to take it upon themselves "to uphold the constitutional obligation that underlies the Mount Laurel doctrine” (456 A2d, at p 490).
Focusing on the serious import of the Mount Laurel doctrine, the court stated: "It was never intended in Mount Laurel I that this awesome constitutional obligation, designed to give the poor a fair chance for housing, be satisfied by meaningless amendments to zoning or other ordinances. 'Affirmative,’ in the Mount Laurel rule, suggests that the municipality is going to do something, and 'realistic opportunity’ suggests that what it is going to do will make it realistically possible for lower income housing to be built. Satisfaction of the Mount Laurel doctrine cannot depend on the inclination of developers to help the poor. It has to depend on affirmative inducements to make the opportunity real.” (92 NJ, at pp 260-261, 456 A2d, at p 442.)
F. Applicability of Exclusionary Zoning Principles
The zoning amendment here is challenged as part of a *80 plan of gentrification to specifically exclude minority and low-income people from New York City, and Chinatown in particular. Although the Berenson and Mount Laurel cases involved challenges of zoning ordinances because they failed to include provisions for multifamily housing, this action is premised on the city’s failure, through its enactment of the zoning amendment, to adequately provide for the construction of low- and moderate-income housing. Here, the plaintiffs do not wish to relocate to the suburbs (the normal situation in exclusionary zoning cases) but rather state that they are compelled by their jobs, cultures and family ties to remain in the inner city region of Chinatown. While the zoning amendment here is not exclusionary as classically defined, if as alleged, it will result in displacement of Chinatown’s low-income residents, then its effect is the same. Accordingly, the proper scope of inquiry for analysis of this proceeding is that line of cases involving exclusionary zoning.
G. Adoption of Mount Laurel Doctrine in New York
In a recent decision, the Appellate Division, Second Department (Suffolk Hous. Servs. v Town of Brookhaven, 109 AD2d 323), held that the Mount Laurel doctrine was inapplicable in New York.
The court stated: "To the extent that plaintiffs wish us to go further, they are reading into the Berenson decision legal doctrines developed in the area of exclusionary zoning in some of our sister States, e.g., the State of New Jersey. However, these decisions go far beyond the law as declared by our own Court of Appeals, which has not, to this date, articulated any constitutional obligation on the part of our municipalities to zone for low-to-moderate-income housing (cf. Southern Burlington County NAACP v Township of Mount Laurel, 67 NJ 151, 336 A2d 713, cert denied 423 US 808; Oakwood at Madison v Township of Madison, 72 NJ 481, 371 A2d 1192; Southern Burlington County NAACP v Township of Mount Laurel, 92 NJ 158, 456 A2d 390). Accordingly, present acceptance of the legal theories advanced by the plaintiffs would require us to work a change of historic proportions in the development of New York zoning law, a step which we respectfully decline to take.” (Suffolk Hous. Servs. v Town of Brookhaven, 109 AD2d 323, 331-332, supra.)
While this decision is entitled to be accorded great respect and weight, it was decided by a court not having appellate jurisdiction over this court and accordingly its hold *81 ing is not binding upon me based on principles of stare decisis. (See, People v Waterman, 122 Misc 2d 489, 495, n 2 [Crim Ct, NY County 1984]; Creagh v Stilwell, 128 Misc 2d 213 [Civ Ct, NY County]; cf. Mountain View Coach Lines v Storms, 102 AD2d 663 [2d Dept 1984].) Accordingly, I may consider the arguments presented in favor of and in opposition to the issue presented and reach an independent determination.
The underpinnings of the Mount Laurel doctrine and the Berenson doctrine are the same. Thus "the constitutional power to zone, delegated to the municipalities subject to legislation, is but one portion of the police power and, as such, must be exercised for the general welfare.” (Mount Laurel II, 92 NJ, at p 208, 456 A2d, at p 415.) And the importance of adequate housing cannot be doubted — "[h]ousing is a necessary of life.” (Block v Hirsh, 256 US 135, 156 [1921].) As the court in Mount Laurel II said: "When the exercise of [the police] power by a municipality aifects something as fundamental as housing, the general welfare includes more than the welfare of that municipality and its citizens: it also includes the general welfare — in this case the housing needs— of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality. Municipal land use regulations that conflict with the general welfare thus defined abuse the police power are unconstitutional * * * The clarity of the constitutional obligation is seen most simply by imagining what this state could be like were this claim never to be recognized and enforced; poor people forever zoned out of substantial areas of the state, not because housing could not be built for them but because they are not wanted * * * It is a vision not only at variance with the requirement that the zoning power be used for the general welfare but with all concepts of fundamental fairness and decency that underpin many constitutional obligations.” (92 NJ, at pp 208-210, 456 A2d, at p 415.)
It was based on those crucial interests that the New Jersey Supreme Court pronounced the Mount Laurel doctrine. And, in Mount Laurel II, this doctrine was expressly broadened in scope to cover the inner city setting as well as "developing” areas. The court stated: "Every municipality’s land use regulations should provide a realistic opportunity for decent housing for at least some part of its resident poor who now occupy dilapidated housing. The zoning power is no more abused by keeping out the region’s poor than by forcing out the resident poor. In other words, each municipality must provide a realis *82 tic opportunity for decent housing for its indigenous poor except where they represent a disproportionately large segment of the population as compared with the rest of the region. This is the case in many of our urban areas.” (92 NJ, at pp 214-215, 456 A2d, at p 418.)
The interests and principles involved in Berenson are the same as those faced in Mount Laurel — the distinguishing feature between the two doctrines is the remedy the courts adopted in attempting to combat the problem of inadequacy of housing opportunities (i.e., the adoption of a "well-balanced plan” test in one, and the imposition of an affirmative constitutional obligation in the other).
But, in terms of zoning for low-income housing, it appears that the impact of the Mount Laurel doctrine upon New Jersey has been far greater than the Berenson decision has been upon New York. In an article entitled Nolon, Exclusionary Zoning: New York, New Jersey Cases Compared (NYLJ, July 2, 1985, p 1, col 1, p 24, col 1), the author reported:
"The Mount Laurel cases have resulted in rezoning by communities throughout New Jersey that will likely lead to the construction of a large number of lower- and middle-income housing units * * *
"Under the Berenson cases in New York, rezoning has occurred but it will not result in the production of lower income housing. The contested parcel of land in the Town of New Castle, the defendant in the Berenson case, is currently being developed. On that site, 177 condominiums will be built at just over three units per acre. They will sell for $180,000 to $290,000 * * *
"The direct effect of the Berenson cases has been limited mainly to the defendant municipality.”
The evidence thus suggests that New York’s attempts to serve its people’s general welfare, particularly the needs for adequate housing by persons of low and middle income, by focusing on whether there exists a properly balanced and well-ordered plan for the community, has been unsuccessful in promoting these people’s interests.
While New York courts have previously been hesitant to adopt the Mount Laurel doctrine because it places a heavier burden on municipalities, upon consideration of the important constitutional considerations at stake, it is my opinion that it is now appropriate to adopt the Mount Laurel doctrine as the law of New York. Moreover, at the time Berenson was decided *83 by the Court of Appeals, Mount Laurel II had not yet been decided. The Mount Laurel II decision not only expands upon the reasoning initially set forth in Mount Laurel I, but also discussed its application within the urban setting.
I conclude that the Mount Laurel doctrine is applicable in New York and in this case.
H. Analysis of Whether the Complaint States Cause of Action
Against this factual background and review of applicable cases, an examination of the complaint must be made to determine if a cause of action is stated under the Berenson or Mount Laurel standards. I hold that the allegations of the complaint satisfy the requirements of each of these standards sufficient to defeat defendants’ motion to dismiss.
1. Mount Laurel Standard
First, under the Mount Laurel doctrine, plaintiffs allege that the defendants have impermissibly overlooked the housing needs of Chinatown’s current and future residents — that implementation of the zoning amendment will contravene the general welfare by promoting development which will displace these predominantly low-income Asian Americans from Chinatown and preclude any reasonable opportunity for future development of low- and moderate-income housing there. If plaintiffs were able to prove that the zoning amendment leads to unwarranted displacement and circumvents New York City’s obligation to affirmatively provide a realistic opportunity for the construction of low-income housing, then the plaintiffs may be successful at trial.
In this regard, "[t]he zoning power is no more abused by keeping out the region’s poor than by forcing out the resident poor.” (Mount Laurel II, 92 NJ, at p 214, 456 A2d, at p 418.)
Studies indicate that low-income individuals’ identities are usually deeply connected to local areas and as a result, they are particularly hurt by the trouble, cost, psychological trauma and political impotence associated with forced displacement. (LeGates and Hartman, Displacement, 15 Clearinghouse Rev 207 [July 1981].) Thus, "Since most notably in the working class, effective relationships with others are dependent upon a continuing sense of common group identity, the experience of loss and disruption of these affiliations is intense and frequently irrevocable.” (Fried, Grieving for a Lost Home, The Urban Condition, People and Policy in the Metropolis [1963].)
As a result of the unique history and social structure of *84 Chinatown, it is claimed that its residents’ identities are deeply rooted and interwoven with the local area. Plaintiffs conclude that displacement would be particularly devastating on its low-income residents for the preceding reasons. Moreover, it is alleged that dislocation would be especially traumatic for the many elderly and new immigrants of Chinatown who have very little knowledge of the English language and who are dependent on the cultural and social resources there.
So plaintiffs seek to emphasize not only the city’s failure to affirmatively provide a reasonable opportunity for the construction of low-income housing, but also the grave consequences which they believe will follow if the amendment were to be upheld.
The defendants, however, argue that displacement will not result from the zoning amendment’s implementation. It is their position that the zoning amendment comports with the requirements of the Mount Laurel doctrine. They contend that Mount Laurel II does not require municipalities to use any particular measures to secure low-income housing and further that the court specifically indicated that the municipal obligation to make the construction of low-income housing realistically possible could be met by providing incentives for the development of low-income housing. Thus, the court stated: "The municipal obligation to provide a realistic opportunity for the construction of its fair share of low and moderate income housing may require more than the elimination of unnecessary cost-producing requirements and restrictions. Affirmative governmental devices should be used to make that opportunity realistic, including lower-income density bonuses and mandatory set-asides [of low-income housing]”. (92 NJ, at p 217, 456 A2d, at p 419.)
The defendants, therefore, claim that the incentive of lower-income density bonuses to developers set forth in the zoning amendment is sufficient to ensure that the needs of the Chinatown community will be satisfied and therefore no further provisions, such as mandatory set-asides, are required.
But, while it is true that the court stated that affirmative measures such as incentive programs may satisfy a municipality’s obligation, this does not mean that because the defendants here are utilizing an incentive program that the amendment will automatically attain a rubber stamp of approval.
In fact, the Mount Laurel II court recognized that there may be instances where incentive techniques will not suffice *85 and instead, more extensive measures may be needed and required. The court, on this point, stated: "Sole reliance on the 'incentive’ techniques (or, indeed, reliance exclusively on any one affirmative device) may prove in a particular case to be insufficient to achieve compliance with the constitutional mandate [to promote the general welfare]”. (Mount Laurel II, 92 NJ, at p 267, 456 A2d, at p 446.)
Thus, the fact that the zoning amendment utilizes incentive devices does not necessarily mean that it is valid as a matter of law, entitling the defendants to a grant of their motion to dismiss. Instead, this issue must be explored at trial. Moreover, as discussed later on, the plaintiffs contend that the incentives provided for in the zoning amendment are unsatisfactory, illusory and actually frustrate the construction of low-income housing in Chinatown.
For these reasons, I determine that the plaintiffs have adequately stated a cause of action under the Mount Laurel doctrine.
2. Berenson Standard
Have the plaintiffs alleged a cause of action under the Berenson standard?
The plaintiffs attack the zoning amendment on the ground that it is not responsive to the Study’s finding that the critical need of the Chinatown community is for affordable quality housing for both its current and future low-income residents. This is elucidated at the outset, they argue, in the introductory section (§ 116-00) of the zoning amendment which does not articulate the construction of low-income housing as one of its goals.[7] The zoning amendment, according to the plaintiffs, ignores this critical need and instead, in application, will *86 result in only luxury housing, violating the constitutional mandate to exercise the police power for the benefit of the public welfare, health and safety.
Plaintiffs further allege that neither the zoning amendment, nor the Study upon which it was based, constitutes a well-balanced plan. They contend that the Study is piecemeal, inconclusive, discriminatory and based upon insufficient data. Even accepting the Study, the plaintiffs contend it offers no basis upon which a mixed-income district may be created because the Study declared that there is a critical need for affordable, quality housing for Chinatown’s low-income residents. It is further contended that the zoning amendment does not address or entail any meaningful course of action to effectively deal with or alleviate these community needs identified by the Study.
It is also claimed that the zoning amendment does not relate at all to city-wide or regional needs and resources as is required under the second prong of the Berenson test.
To illustrate, plaintiffs cite the special permit granted to Henry Street Partners for the construction of a 21-story residential condominium building. While the building will include community facility space (in return for which the developer has been given a floor area bonus), there are no set-asides for low-income housing. Plaintiffs contend that any development of open space should be devoted to the construction of low-income housing since the space available for new construction is so crucially limited. They further allege that the city is engaging in spot zoning by considering or approving plans in isolation without considering their cumulative effect. The plaintiffs therefore fear that if the Henry Street project is allowed, other similar projects will be approved, resulting in the construction of luxury dwellings only. This result, they argue, is contrary to the needs of Chinatown.
Moreover, the plaintiffs argue that the incentives provided to developers pursuant to the zoning amendment are illusory and may never result in the construction of low-income housing.
First of all, there is an apparent ambiguity in the text of *87 the zoning amendment with respect to whether, in order to qualify for a floor area bonus, a developer must provide community facility space as well as dwelling units for low- and moderate-income families, or whether providing only one will suffice. Defendants read the zoning amendment and sections 116-11 and 116-12, in particular, as requiring the provision of either community facility space or low- and moderate-income dwelling units to qualify for a floor area bonus. Read in isolation from the remainder of the amendment, defendant’s position would seem to be sustainable. But plaintiffs point to two other provisions of the amendment, sections 116-10 and 116-50 (5), in support of their contention that both amenities must be satisfied before a developer is entitled to receive a floor area bonus. The section which most strongly supports this argument is section 116-50 which states:
"Requirements For Applications
"An application to the Commission for the grant of a special permit pursuant to this Chapter shall include the following
"(5) Floor plans showing the apartment size and where applicable community facility space and dwelling units for low and moderate income families”.
Where a legislative act is ambiguous or portions are inconsistent "[a]ll parts * * * must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute and every part and word thereof.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 98 [a].) Applying this canon, plaintiffs submit that even if the zoning amendment were valid (and they strenuously contend otherwise) the defendants have construed it contrary to its express terms resulting in its unconstitutionality, as applied. The plaintiffs contend that if the defendants’ position were accepted, then developers would obtain floor area bonus, a highly beneficial bonus in light of the existing zoning restrictions in the Chinatown area, without ever providing for low-income housing. Indeed, this exactly is the situation with respect to the grant of the special permit to Henry Street Partners. Henry Street Partners received their permit based on their proposal to provide community facility space; no construction of low- or moderate-income housing was proposed in connection with their application.
While the court is unable at this time to reach a conclusion as to the proper interpretation, the allegations raise an issue with respect to proper statutory construction.
*88 Assuming that the defendants’ position is correct, the plaintiffs claim that developers will never opt to provide low-income dwellings for the reason that it is economically more advantageous for them to always provide one of the other "amenities” in order to receive a desirable grant of a floor area bonus. The result, according to this theory, is an illusory promise of low-income housing. In support of this proposition, plaintiffs compare the floor area bonuses available for the various amenities and conclude that the bonus of up to two square feet granted for construction of low-income housing (§ 116-12) is insignificant in comparison to the other bonus provisions. For example, where community facility space is supplied, a developer is eligible to receive a substantially greater floor area bonus of up to seven square feet (§ 116-11). Therefore, it is claimed that low- and moderate-income dwellings will never result from the zoning amendment.
I hold that the complaint states a cause of action under the Berenson standard. Therefore, assuming plaintiff’s allegations to be true, the zoning amendment, information or application may be held to violate the Berenson standard that zoning be enacted in accordance with a well-considered plan. (38 NY2d, at p 110.)
And, while it is true that a community need not "maintain a certain quantitative proportion between various types of development^]” (Berenson v Town of New Castle, 38 NY2d, at p 109), in light of the needs of the Chinatown community, a well-balanced plan may be held to consist of a plan which facilitates the construction of quality low-income housing. The plaintiffs and defendants differ over whether the zoning amendment accomplishes this. This issue must be resolved at trial.
Similarly, the trial court must examine the second prong of the Berenson test — that of regional housing needs and requirements. That court will need to determine whether the needs of the Chinatown community can be satisfied by neighboring communities. Consideration must be given to the question of whether neighboring communities within Manhattan or possibly its surrounding boroughs can accommodate Chinatown’s low-income needs and whether this would be appropriate in view of the character of Chinatown and the possible effects that displacement would have on its residents.
V. HENRY STREET PARTNERS SPECIAL PERMIT
The third cause of action attacks the validity of the special *89 permit granted to Henry Street Partners by the Board of Estimate on April 14, 1983.
The defendants contend that the plaintiffs’ challenge to the special permit, though denominated an action for declaratory judgment, is in the nature of a CPLR article 78 proceeding and accordingly the applicable Statute of Limitations is a four-month period as prescribed by CPLR 217. (Solnick v Whalen, 49 NY2d 224.) And, since plaintiff did not commence this action until approximately five months after the permit was granted, the defendants contend that this cause of action is time barred and must be dismissed.
Here, however, the plaintiffs attack the grant of the special permit on constitutional grounds. In such cases, the four-month Statute of Limitations is not controlling. (See, Lutheran Church v City of New York, 27 AD2d 237 [1st Dept 1967].) The court stated: "Where an administrative act is attacked on the basis that the body acted without power and its decision is void, the remedy of a declaratory judgment is not foreclosed by the circumstances that a hearing was had, that a determination was made and that a proceeding was available to the party affected to review such determination. The exercise of a power which offends against the Constitution may be attacked at any time * * * The commission cannot give legality to an unconstitutional or void statute by exercising power under it.” (Supra, at p 239.)
The plaintiffs’ challenge to the special permit is twofold. First, it is predicated on their allegation, as set forth in the first two causes of action, that the underlying zoning amendment is unconstitutional. Second, it is alleged that the specific grant of the special permit is unconstitutional because it "violates the constitutional obligation to zone for the general welfare in that it fails to provide a realistic opportunity for the construction of low-income housing.”
Here, the plaintiffs are not contesting the reasonableness or propriety of the defendants’ actions, or otherwise attacking the defendants’ decisions on the ground that they are arbitrary and capricious. (See, Matter of New York City Hous. Auth. v Commissioner of Envtl. Conservation Dept., 83 Misc 2d 89 [Sup Ct, Queens County 1975].) To the extent it can be argued that plaintiffs are challenging the defendants’ actions on these grounds, then that aspect of their challenge is barred by the four-month limitation period. (Matter of Levine v State Div. of Hous. & Community Renewal, 126 Misc 2d 531 [Sup Ct, *90 NY County 1984]; Lutheran Church v City of New York, 35 NY2d 121 [1974].)
However, since this cause of action rests on constitutional grounds, I hold that it is not barred by CPLR 217 and further that a cause of action is stated, sufficient to defeat defendants’ motion to dismiss. Additionally, that aspect of Henry Street Partners’ motion attacking service is denied with leave to renew because the allegations are not made by an individual with personal knowledge.
VI. TAX EXEMPTION
In the fourth cause of action, the plaintiffs attempt to enjoin the defendants from granting any form of tax exemption or abatement to Henry Street Partners on the ground that the proposed construction would contravene the general welfare and therefore a grant of a tax abatement would be contrary to the State and city public policy.
The defendants contend that this cause of action must be dismissed on the ground that it is premature and fails to allege the existence of a justiciable controversy because Henry Street has not yet applied for a tax exemption. Specifically, the defendants contend that the Department of Housing Preservation and Development has not received an application from Henry Street Partners for a tax exemption pursuant to Real Property Tax Law § 421-a. The plaintiffs do not deny this, but instead allege that Henry Street Partners "has sought to qualify for” a real property tax abatement.
The facts underlying this cause of action are not sufficiently matured so as to constitute a concrete justiciable controversy.
Declaratory judgment is not available when the existence of such a controversy is dependent upon the happening of future events which may, in fact, never occur. (Prashker v United States Guar. Co., 1 NY2d 584, 592 [1956].)
Accordingly, defendants’ motion to dismiss the fourth cause of action is granted.

. "Displacement occurs when any household is forced to move from its residence by conditions which affect the dwelling or its immediate surroundings, and which:
"1. Are beyond the household’s reasonable ability to control or prevent.
"2. Occur despite the household’s having met all previously imposed conditions of occupancy and
"3. Make continued occupancy by that household impossible, hazardous or unaffordable.” (Grier and Grier, Urban Displacement Reconnaissance [pamph 1978].)
Some of the distinct and separate causes for displacement identified in the Grier and Grier report were planning and zoning decisions, and rehabilitation and renovation of public housing. Displacement is also a possible result of gentrification. Gentrification occurs when new residents who are proportionately young, white higher income professional, technical and managerial workers with higher education levels replace older residents who are disproportionately low income, the working class and/or the poor, minority and/or ethnic group members and the elderly, in previously deteriorated inner city housing. (Marcuse, Gentrification, Abandonment and Displacement: Connections, Causes and Policy Responses in New York City, 28 J of Urb and Contemp L [1985].) Despite the negative effects, a policy encouraging gentrification is nevertheless pursued because the city assumes that gentrification improves the quality of housing and revitalizes important sections of the city.

. Manhattan Bridge Area Study was prepared by the New York City Department of City Planning in conjunction with the special Chinatown task force and was published in 1979. The Study enumerated the various functions of the Chinatown area: (a) as a point of entry for new Chinese/ Asian immigrants; (b) as a housing resource for low-income people; (c) as a major tourist attraction, and (d) as a center of Chinese culture and services.

. The two subareas of the Manhattan Bridge Study Area are the Chinatown Study Area (which is bounded generally by Delancey Street on the north, Allen Street on the east, Monroe and Madison Streets on the south, Baxter Street and the Bowery on the west), and the old Chinatown Area (which is bounded generally by Canal Street on the north, Bowery on the east, Worth Street on the south and Baxter Street on the west).

. Pursuant to section 116-10 the Commission may, by special permit, allow an increase in the floor area of a new residential building in accor *73 dance with section 116-11 (floor area bonus for community facilities) and section 116-12 (floor area bonus for dwelling units for low- and moderate-income families). Section 116-11 provides that for every square foot of floor area provided for use as community facility space, the total floor area permitted on the zoning lot may be increased up to 7 square feet (but) in no event may the total floor area ratio of any new development exceed 7.5. Section 116-12 provides that for every square foot of floor area provided as dwelling units for low- and moderate-income families, the total floor area provided as dwelling units for low- and moderate-income families, the total floor area permitted on the zoning lot may be increased by 2 square feet (but) in no event may total floor area ratio of any new development exceed 7.5. Another method of achieving floor area bonus is pursuant to sections 116-20 and 116-21 which provide, respectively, that in order to encourage the rehabilitation of substandard buildings within the District, the Commission may, by special permit, allow an increase in the floor area of a new residential building where the developer has selectively demolished portions of a separate existing building as part of its rehabilitation requirement. For every square foot of floor area which is demolished in a granting rehabilitated development lot and transferred to a receiving new development lot when both are developed in conjunction, the total floor area permitted on the zoning lot may be increased up to 6 square feet (but) in no event may the total floor area of any new development exceed 7.5.

. Pursuant to section 116-50 of the zoning amendment a special permit for a proposed construction project will be granted if the application for the permit contains the following.
(1) A site plan showing the location and tenancy of any residential or other building on the zoning lot which will contain new development and which clearly indicates that the site is vacant or substantially vacant.
(2) A site plan showing the location and configuration of the new development including all entrances and exits for pedestrians and vehicles.
(3) A landscaping plan showing the treatment of all open spaces, roof areas, and public sidewalks adjacent to the zoning lot, and indicating compliance with section 116-40 (mandatory tree planning).
(4) In the case of a substantially vacant site or a granting rehabilitated development lot, an affidavit affirming compliance with section 116-30 (relocation provisions for substantially vacant site or granting rehabilitated developments).
(5) Floor plans showing the apartment site and distribution and where applicable community facility space and dwelling units for low- and moderate-income families.
(6) In the case of a building which conforms to section 116-20 (special floor area transfer provisions), a site plan of the entire special district indicating the granting rehabilitated development lot and the receiving new development lot.

. Subsequently, New Castle amended its ordinance providing for the zoning of multifamily housing and the ordinance was held to be valid. (See, Blitz v Town of New Castle, 94 AD2d 92 [2d Dept 1983].)

. The goals, as stated in section 116-00, are:
"(a) to preserve the residential character of the community and encourage the development of new housing on sites which require minimal residential relocation;
"(b) to promote the opportunities for people to live in close proximity to employment centers in a manner which is consistent with existing community patterns;
"(c) to provide an incentive for the creation of new community facility space which is required to meet the unique needs of the community;
"(d) to permit new construction within the area which is sensitive to the existing urban design character of the neighborhood;
"(e) to provide an incentive for a mixture of income groups in the new development so as to not substantially alter the mixture of income groups presently residing in the neighborhood;
"(f) to promote the rehabilitation of the existing older housing stock, and *86 thereby provide a renewed housing resource meeting modern standards at the same time protecting the character and scale of the community;
"(g) to promote the most desirable use of the land in the area and thus to conserve the value of land and buildings and thereby protect the City’s tax revenues.”