OPINION OF THE COURT
Emily Jane Goodman, J.
Plaintiffs, a coalition of individuals and community organizations, move for an injunction under the Federal Fair Housing Act, alleging discrimination by defendants Mayor Michael Bloomberg, the City of New York and the Department of Housing Preservation and Development, in the rezoning and develop *121 ment of the Brooklyn area known as the Broadway Triangle.[1] Their chosen developers, nonparty United Jewish Organizations of Williamsburg, Inc. (UJO), and nonparty Ridgewood Bushwick Senior Citizens Council, Inc. (RBSCC), plan to construct “affordable” housing within the predominately white Community District 1 (Community 1), the Williamsburg-Greenpoint neighborhood, even though the Broadway Triangle includes land in the overwhelmingly nonwhite Community District 3 (Community 3), Bedford-Stuyvesant neighborhood.[2] The City Council, at the urging of the office of the Mayor, rezoned the industrial area to a residential area, with limited building heights between 70-80 feet. Plaintiffs contend that the rezoning, and the designation of UJO and RBSCC in a no-bid process, to construct and design low-rise buildings[3] containing numerous large apartments, despite the general demand for smaller apartments, perpetuates segregation and disproportionately impacts a minority group or groups. Plaintiffs further maintain that defendants have failed to consider and analyze, as required by law, whether other alternatives exist, and that defendants have not demonstrated that their policies and actions are furthered by legitimate interests which cannot be satisfied by lesser or nondiscriminatory alternatives. The court agrees.
The Williamsburg area has been marred by a long history of federal court discrimination battles, fueled by the desire of Hasidic families to reside together in Williamsburg for religious reasons (see Ungar v New York City Hous. Auth., 2009 WL 125236, 2009 US Dist LEXIS 3578 [SD NY 2009], affd 363 Fed Appx 53 [2d Cir 2010]). Their need is entirely based on “proximity to the basic necessities of Jewish living, i.e., synagogues, yeshivas, and stores that feature products they need to carry out their religious observance and way of life” (2009 WL 125236 *122 at *3, 2009 US Dist LEXIS 3578 at *7). And their desire has resulted in “historic over-representation of Hasidic in the Williamsburg projects” (Ungar v New York City Hous. Auth., 363 Fed Appx 53, 56 [2d Cir 2010] [quoting plaintiffs’ brief]) such that large apartments in three New York City Housing Authority (NYCHA) developments (Independence, Taylor-Wythe and Williams) were “occupied almost entirely by Jewish families, and ... all families on the waiting lists for apartments of seven rooms or more in the three Williamsburg developments are Hasidic” (2009 WL 125236 at *16, 2009 US Dist LEXIS 3578 at *42).[4]
To explain away the racial and ethnic contrasts in Williams-burg and Bedford-Stuyvesant (the 2000 census indicates that Community 1 is only 5.5% black; Community 3 is 77% black [plaintiffs’ exhibit 11]), defendants submit to this court, “[t]here are no systematic barriers to blacks living in Williamsburg” (defendants’ mem at 41). In most surprising language, the City asserts that “[t]he Court cannot ignore the possibility that blacks have chosen not to apply to move into affordable housing in Williamsburg because of personal preference not to live in that area” (id.). Thus, according to the Mayor and his codefendants, “[t]he most likely explanation” for blacks comprising only a minute portion of the applicant pool in Williamsburg “is individual choice” (defendants’ mem at 42). Although cases have demonstrated Hasidic families’ desire to live in Williamsburg only, there is absolutely no evidence indicating that black applicants desire to avoid living in that area, and not only is the suggestion contrary to plaintiffs’ position in this litigation, but any offense taken by the suggestion would be easily understood, especially when taken together with defendants’ admitted failure to consider racial impact in their plan.
A hearing was held over eight days. For the reasons explained below, and after considering the testimony and evidence and post-hearing briefs, the court finds that plaintiffs have established (1) a likelihood of success on the merits under the Fair Housing Act;[5] (2) irreparable harm absent injunctive *123 relief; and (3) a balancing of the equities in their favor (see Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]; City of New York v Untitled LLC, 51 AD3d 509, 511 [1st Dept 2008]; Borenstein v Rochel Props., 176 AD2d 171, 172 [1st Dept 1991]).[6]
The majority of defendants’ arguments have been previously made and rejected. They include the arguments that, despite the existing high-rise middle income Mitchell-Lama and affordable NYCHA buildings right across the street and in the immediate surrounding area, the density/height increases advocated by plaintiffs would burden the infrastructure and are out of “context” in the neighborhood — a notion dismissed by this court following a site inspection (defendants’ mem at 18-20, 22-23); that the apartments are awarded by a monitored “Race Blind Lottery” so that anyone who qualifies can live there, after application of the preference for Community 1 residents (id. at 27-32, 36-37); that awarding contingent site authorizations to UJO and RBSCC is not unusual as authorizations are routinely issued to a wide variety of developers, and New York State has a financial incentive for construction of large apartments (id. at 51-55); that the Williamsburg projects Schaeffer Landing and Palmer’s Dock include a well-represented Hispanic population, and the fact that only five black households out of 86 households qualified for Schaeffer Landing and two black households out of 32 households qualified for Palmer’s Dock is attributable to *124 their choice “not to do so because the rent for a NYCHA apartment is going to remain lower than the rent for an affordable housing apartment” and because blacks did not likely apply because of “personal choices [which] cannot be attributed to any City policy” (id. at 34-36, 49-51).[7] Defendants further argue that the Fair Housing Act does not mandate zoning for taller buildings to maximize affordable housing (id. at 26) and does not trump environmental considerations (id. at 25).[8] However, it is well established that race neutral policies violate the Fair Housing Act if racial segregation is perpetuated or if a minority group or groups are adversely impacted.
The goal of the Fair Housing Act is to promote “open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat” (Otero v New York City Hous. Auth., 484 F2d 1122, 1134 [2d Cir 1973]). The act provides that it is unlawful to “otherwise make unavailable” or deny a dwelling to any person because of race, among other things, and to discriminate against any such person in the terms, conditions or privileges of sale or rental of a dwelling (42 USC § 3604 [a], [b], [c]). The phrase “otherwise make unavailable” has been interpreted to address a wide variety of discriminatory housing practices, including discriminating zoning practices (see LeBlanc-Sternberg v Fletcher, 67 F3d 412, 424 [2d Cir 1995]). A claim is stated under the Fair Housing Act when the municipality creates a land development plan or zoning classification which discriminates, even though the plan is effectuated by private developers (see Huntington v Huntington Branch, NAACP, 488 US 15 [1988]; Rivera v Incorporated Vil. of Farmingdale, 571 F Supp 2d 359 [ED NY 2008]). Government is not permitted to engage in “deliberate omissions that have the foreseeable effect of perpetuating known segregation” (United States v City of Yonkers, 96 F3d 600, 617 [2d Cir 1996]).
To prove a prima facie case under the Fair Housing Act, a plaintiff need demonstrate only that the challenged actions had a discriminatory effect (see Williamsburg Fair Hous. Comm. v *125 New York City Hous. Auth., 493 F Supp 1225 [SD NY 1980]; see also Huntington Branch, N.A.A.C.P v Town of Huntington, 844 F2d 926, 933 [2d Cir 1988], affd 488 US 15 [1988] [“A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group”]). A prima facie case of discriminatory effect is made by showing that a defendant’s actions either (1) perpetuate segregation, harming the community in general, or (2) disproportionately impact a minority group (see Huntington Branch, N.A.A.C.P. v Town of Huntington, 844 F2d 926 [1988], supra; Suffolk Hous. Servs. v Town of Brookhaven, 109 AD2d 323, 335 [2d Dept 1985], affd 70 NY2d 122 [1987]). If a plaintiff makes a prima facie showing, the burden shifts to the defendant to prove that its actions furthered a “legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect” (Ungar v New York City Hous. Auth., 363 Fed Appx 53, 55 [2010], supra). A plaintiff is ordinarily required to include statistical evidence to show the disparity between groups, but other evidence can also be used (id.).[9]
That showing has been made here in the requisite evidentiary detail (see Scotto v Mei, 219 AD2d 181, 182 [1st Dept 1996]). The testimony of Dr. Lance Freeman, Ph.D., an expert in demographic statistical analysis and residential segregation and an associate professor at Columbia University’s Graduate School of Architecture, Planning, and Preservation, supports a finding that plans to construct buildings of only six to seven stories, and the creation of very large apartments for very large families (despite the far greater local demand for smaller apartments), favors one religious group to the detriment of others. Dr. Freeman pointed out that Brooklyn is a fairly segregated borough, with concentrations of blacks, whites and Hispanics in particular areas (Freeman July 13 tr at 63-65). Census data does not include information on religion, but does record a category referred to as Yiddish speakers, which is undisputedly a language spoken by Hasidim (id. at 61:15-63:20, 69:2-70, 76:13- *126 18).[10] Yiddish speakers are concentrated in the northwest area of the Broadway Triangle, and the concentration of whites appears to be increasing in the area adjacent to the proposed developments (plaintiffs’ exhibit 7-9; Freeman tr July 13 at 64:17-70:09). The applications submitted by UJO and RBSCC indicate that 43% of the units would be three- and four-bedroom apartments,[11] and defendants concede that the City’s 2010 Consolidated Plan (a planning tool required by Housing and Urban Development for the City to receive federal funds) indicates that the city-wide need for large apartments was only 11% (defendants’ mem at 48). Dr. Freeman testified, and the court accepted, that, based on 2000 census data, the percentage of qualifying individuals in Community Districts 1 and 3 needing small apartments as compared to large apartments was: 75% of blacks needed small apartments (while only 25% needed large apartments), 68% of Hispanics needed small apartments (while only 32% needed large apartments), 68% of whites needed small apartments (while only 32% needed large apartments) and 40% of white/Yiddish speakers needed small apartments (while 60% needed large apartments) (Freeman July 13 tr at 87:15-90:07). Thus, Dr. Freeman noted that, while approximately 9,000 Yiddish speaking individuals in Community Districts 1 and 3 needed large apartments, there are approximately 90,000 blacks and Hispanics who would need small apartments (id. at 87:15-90:18). Using census data to calculate specifically the need in Community 1, Freeman testified that 88% of blacks needed small apartments (while only 12% needed large apartments), 70% of Hispanics needed small apartments (while only 30% needed large apartments), 68% of whites needed small apartments (while only 32% needed large apartments) and 40% of white/Yiddish speakers needed small apartments (while 60% needed large apartments) (id. at 90:08-18). Dr. Freeman testified that while blacks make up five percent of those who would qualify for a small apartment in Community 1, they make up only one percent of those who qualify for a large *127 apartment (id. at 83:13-83:17). On the other hand, Yiddish speaking households would make up eight percent of those who would qualify for a small unit, but would make up 24.6% of those who would qualify for a large unit (id. at 83:18-83:22). While defendants point to a demand for large apartments and a shortage of them, it is well known that there is a shortage of housing of all sizes throughout New York City. In light of these statistics, the need for large apartments (and a greater need for small apartments) cannot justify construction of very commodious spaces, when such apartments are proposed only where the white/Yiddish speakers are the sole demographic group for whom the need for large apartments is greater.[12]
The community preference only serves to perpetuate segregation in the Broadway Triangle. It is undisputed that residents (and former residents to whom outreach would be expected) from the predominantly white Community 1 area would be given a first preference for 50% of the units. Dr. Freeman testified that as a result of the Community 1 preference, the racial composition for the projects would be 3% black, 37% Hispanic, 48% white, and 14% white/Yiddish speakers; whereas, extending the preference to Community 3 would result in residents being 31% black, 34% Hispanic, 27% white, and 8% white/Yiddish speaking (id. at 97:16-98:09).[13] Although no finding has been made by the court that the community preference must be extended to Community 3, it is noteworthy that such an extension might act to correct the imbalance in the applicant pool in the Broadway Triangle.[14]
*128 Moreover, as conceded by HPD’s witnesses Holly Leicht and Jack Hammer,[15] defendants failed to consider the impact of the development on racial segregation (Leicht July 22 tr at 73:20-74:17, 119:3-120:4; Hammer Sept. 14 tr at 24:10-24:24), despite the requirement to do so, as recipients of federal funds (see e.g. 42 USC § 3608 [e] [5] [mandating that Housing and Urban Development shall “administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of (the Fair Housing Act)”]; 42 USC § 5304 [b] [2] [requiring all recipients of federal housing grants to certify that the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act and the grantee will affirmatively further fair housing]; Otero v New York City Hous. Auth., 484 F2d at 1133-1134 [finding that defendant was “under an obligation to act affirmatively to achieve integration in housing” and that the Fair Housing Act “requires that consideration be given to the impact of proposed housing programs on the racial concentration in the area in which the proposed housing is to be built”]; United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v Westchester County, N.Y., 668 F Supp 2d 548, 563 [SD NY 2009] [recipients of federal housing funds are obligated to conduct an analysis of impediments to fair housing, and providing housing without analyzing its segregative impact “is not in and of itself sufficient to affirmatively further fair housing”]).
It is also conceded that defendants did not analyze or evaluate the impact of the community preference on segregation in the Broadway Triangle (Leicht July 22 tr at 119:17-120:4). There can be no compliance with the Fair Housing Act where defendants never analyzed the impact of the community preference (see Langlois v Abington Hous. Auth., 234 F Supp 2d 33, 70 [D Mass 2002] [residency preference was improper where defendants had not “met their duty to affirmatively further fair housing, which included an obligation to investigate the potential effects of their proposed residency preferences before their implementation”]).
Defendants’ argument that they complied with the Fair Housing Act based on a four-year-old 2007 city-wide fair hous *129 ing analysis is unpersuasive. To support this tortured argument, defendants revise existing case law (defendants’ mem at 7-9). In Asian Ams. for Equality v Koch (128 AD2d 99 [1st Dept 1987]), the Court upheld the City’s zoning of a Special Manhattan Bridge District in Chinatown, even though the City did not direct the construction of low and moderate housing. Although the Court noted that “not every amendment to [the New York City Zoning Resolution] ‘must contain some sort of housing balance’ ” (id. at 117), segregation was not an issue in that case. And although not every zoning amendment must contain a housing balance, the proposed developments are planned where housing is already out of balance. Where balance is lacking, town ordinances have been invalidated for exclusionary zoning (see Berenson v Town of New Castle, 38 NY2d 102 [1975]). Similarly, the case of Strykers Bay Neighborhood Council, Inc. v City of New York (695 F Supp 1531, 1542-1543 [SD NY 1988]) does not compel a different result. In that case, although the court pointed out that construction of one luxury building, on site 30A, could not be viewed in isolation, even if it impacted minorities, it also pointed out that 2,700 low-income projects were also constructed in connection with that urban renewal project, meaning that the Upper West Side Manhattan neighborhood had become “significantly more integrated” (id.). Here, the three proposed developments will not only not foster integration of the neighborhood, but they will perpetuate segregation in the Broadway Triangle.
In light of the above, plaintiffs have demonstrated a likelihood of success on the merits of their Fair Housing Act claim. Further, defendants have not demonstrated that their policies and actions are furthered by legitimate interests, which cannot be satisfied by lesser, nondiscriminatory alternatives. This is especially so because they have not even evaluated the proposed developments’ impact on segregation, and because more inclusive alternatives to the development do exist (including but not limited to extending the preference to Community 3). Because plaintiffs have established a likelihood of success under the Fair Housing Act, the equities lie in their favor and irreparable harm will result unless an injunction is granted — i.e., as a result of discrimination, a deprivation of housing financed with public funds.
*130 Defendants’ one-line request, in their cumbersome 57-page brief,[16] for an “undertaking pursuant to CPLR 6312 (b)” in an unspecified amount, is granted to the extent that the court finds that only a nominal undertaking is warranted (see Daytop Vil. v Consolidated Edison Co. of N.Y., 61 AD2d 933 [1st Dept 1978] [only a nominal undertaking was imposed on a not-for-profit agency]). Not only are the movants comprised of nonprofits and community groups, but defendants have not shown what their own damages would be if the injunction were to be incorrectly granted.
It is hereby ordered that the motion for a preliminary injunction is granted; and it is further ordered that defendants and their agents, employees, and all persons acting under their control are enjoined, during the pendency of this action, from transferring city-owned land and proceeding with the development of 100 Throop Avenue, 31 Bartlett Street and 35 Bartlett Street; and it is further ordered that an undertaking is fixed in the amount of $5,000; and it is further ordered that the undertaking be posted forthwith.

. In 1989, the Board of Estimate of New York City, now defunct, created the Broadway Triangle Urban Renewal area comprised of 30 acres surrounding what was then a Pfizer company plant and spanning both sides of the Flushing Avenue border of South Williamsburg and northern BedfordStuyvesant.

. Between January 2008 and January 2009, contingent site authorizations were granted to UJO and RBSCC for 100 Throop Avenue, 35 Bartlett Street and 31 Bartlett Street, which were expected to yield 181 units of affordable housing.

. As noted in the court’s prior decision, it is not disputed that, for religious reasons, Hasidim do not use elevators during the Sabbath, which necessitates their walking up and down stairs, making taller buildings unattractive to them. Although defendants contend that people of all races and ethnic backgrounds can qualify for residences on lower floors (defendants’ mem at 15), that statement is untrustworthy when the applicant pool is not diverse.

. The Hasidic plaintiffs in TJngar unsuccessfully sought to facilitate their religious-based need by seeking a unique accommodation enabling them to have special rights in the application and waiting list protocol so that they could remain in Williamsburg, while other applicants would have to accept apartments when and wherever in the city they became available.

. Plaintiffs seek an injunction under the Fair Housing Act only, although they have also asserted, among other things, equal protection claims, civil *123 rights claims and state and city human rights claims. Unlike the Fair Housing Act, however, equal protection claims, as well as the title VI of the Civil Rights Act of 1964 claim, require proof of intent to discriminate, as well as discriminatory impact (see Arlington Heights v Metropolitan Housing Development Corp., 429 US 252, 268-271 [1977]; Gratz v Bollinger, 539 US 244, 276 n 23 [2003]).
“Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent. Among the factors that are instructive in determining whether racially discriminatory intent is present are: discriminatory or segregative effect, historical background, the sequence of events leading up to the challenged actions, and whether there were any departures from normal or substantive criteria” (Hallmark Developers, Inc. v Fulton County, Ga., 466 F3d 1276, 1283 [11th Cir 2006] [citations omitted]).
No depositions have yet been taken in this action, and no discovery has been had involving correspondence between defendants and UJO and RBSCC. Accordingly, there has been no opportunity for discovery, which might yield evidence of defendants’ intent.

. The court’s decision and order, dated May 20, 2010, dismissed plaintiffs’ State Environmental Quality Review Act and City Environmental Quality Review claims, and the religious discrimination claims brought by certain Hasidic individuals who are not aligned with UJO (2010 NY Slip Op 31258[U] [2010]).

. That five black households out of 86 households qualified at Schaeffer Landing, and that two black households out of 32 households qualified at Palmer’s Dock, is hardly an admirable demonstration that “blacks received twice as many apartments as their percentage in CD 1” (defendants’ mem at 44).

. Contrary to defendants’ argument, plaintiffs do not advocate racial quotas, but merely that defendants comply with the Fair Housing Act.

. Defendants now raise, for the first time in this ongoing litigation, as an afterthought, that plaintiffs lack standing, because the Department of Housing and Urban Development is responsible for ensuring compliance with the Fair Housing Act and for overseeing a certification process (defendants’ mem at 13-14); however, plaintiffs have not brought a direct cause of action under section 3608 of the Fair Housing Act.

. Census data is not available in a form that matches community district boundaries, but the government does provide public use microdata samples, similar to community district boundaries, which Dr. Freeman employed in reaching his findings (Freeman July 13 tr at 75:23-76:12; Gaumer Sept. 13 tr at 77:13-24).

. It is undisputed that the developers have proposed building a total of 89 units which are zero, one or two bedrooms and 68 units which are three or four bedrooms.

. Even if the court were to credit the testimony from the Department of Housing Preservation and Development’s (HPD) witness Elyzabeth Guamer, maintaining that Dr. Freeman misattributed 12,000 Hispanics to Community District 3, when they belonged in Community District 1, such testimony does not address if any significant statistical error would result, and does not contradict the evidence that the greatest demand is for small apartments; nor does it contradict the fact that only a minute percentage of blacks live in Williamsburg. Further, although Gaumer testified that some proportion of three- and four-bedroom families might qualify for both small and large apartments, she did not quantify the number, or testify as to whether a significant statistical error would result because Dr. Freeman did not account for such variations.

. Although community preferences have been routinely offered, and a preference was given in the 1990s to Community 3 (Moed July 13 tr at 35-36), offering any preference is impermissible if it violates the Fair Housing Act.

. Defendants concede that “[t]he racial make-up of the group of people that prevails in obtaining an affordable apartment through the lottery depends on the racial make-up of the applicant pool” (defendants’ mem at 33).

. Ms. Leicht was formerly Deputy Commissioner for Development at the Department of Housing Preservation and Development. Mr. Hammer is the Director of Brooklyn Planning.

. Once again, defendants, unilaterally, have exceeded the page limit for submission of briefs under the Uniform Rules for Trial Courts (22 NYCRR), despite the unprecedented volume of litigation; an ironic development given the acidic complaints by defendants’ counsel that the courts do not resolve the City’s litigation in a sufficiently swift time frame.